# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Diana Meynart-Hanzel et al., | Case No. 1:17-cv-06308 |
| Plaintiffs, | Honorable Judge Harry D. Leinenweber |
| v. | Magistrate Judge Mary M. Rowland |
| Turner Broadcasting System, Inc., et al., | |
| Defendants. | |

## DEFENDANTS' CORRECTED MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................................... 1

II.  STATEMENT OF FACTS .................................................................................................... 2

    A.  Background ................................................................................................................. 2

    B.  The Abundance Of Entertainment Works Featuring Guests At A Rental Property And Ensuing Comedy ................................................................................. 3

    C.  Plaintiffs' Three Works.............................................................................................. 3

        1.  Work No. 1: The *B&B* Sizzle Reel .............................................................. 4

        2.  Work No. 2: The *B&B* Bible........................................................................ 5

        3.  Work No. 3: The *B&B* Treatment ............................................................... 6

    D.  Defendants' *The Guest Book* ................................................................................. 8

III.  PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED ............................................. 13

    A.  The Applicable Legal Standards For Copyright Infringement ............................ 13

    B.  Plaintiffs Conclusory Allegations Of Access Are Insufficient As A Matter Of Law ..................................................................................................................... 14

    C.  A Side-By-Side Comparison Reveals That There Is No Substantial Similarity Between Any Protectable Elements In Plaintiffs' Works And *The Guest Book* ..................................................................................................... 15

        1.  There is No Similarity in Plot. .................................................................... 19

        2.  There is No Similarity in Setting. ............................................................... 21

        3.  There is No Similarity in Characters. ......................................................... 23

        4.  There is No Similarity in Themes. ............................................................... 27

        5.  There is No Similarity in Mood. ................................................................. 27

        6.  There is No Similarity in Pace. ................................................................... 28

        7.  There is No Similarity in Dialogue.............................................................. 28

        8.  There is No Similarity in Sequence of Events. ........................................... 28

        9.  Plaintiffs' Works And *The Guest Book* Do Not Have the Same Title......................................................................................................... 29

10.    Plaintiffs' List of Random Alleged Similarities Cannot Support A Claim And, In Any Event, Is Riddled With Inaccuracies............... 29

IV.    CONCLUSION.................................................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*,
  487 F.Supp.2d 41 (D.Conn. 2007) .......................................................................21

*Alexander v. Murdoch*,
  No. 10-cv-5613, 2011 WL 2802923 (S.D.N.Y. July 14, 2011) ...............................23

*Becker v. Loew's, Inc.*,
  133 F.2d 889 (7th Cir. 1943) .................................................................................23

*Berkic v. Crichton*,
  761 F.2d 1289 (9th Cir. 1985) ..........................................................................19, 20

*Bernal v. Paradigm Talent and Literary Agency*,
  788 F.Supp.2d 1043 (C.D. Cal. 2010) ...................................................................28

*Briggs v. Blomkamp*,
  70 F.Supp.3d 1155 (N.D. Cal. 2014) .....................................................................15

*Brown v. Twentieth Century Fox Home Entm't*,
  14-cv-147, 2015 WL 5081125 (E.D. Ky. Aug. 27, 2015) .......................................18

*Brownmark Films, LLC v. Comedy Partners*,
  682 F.3d 687 (7th Cir. 2012) .................................................................................16

*Cabell v. Sony Pictures Entm't, Inc.*,
  714 F.Supp.2d 452 (S.D.N.Y. 2010) ......................................................................19

*Cholvin v. B. & F. Music Co.*,
  253 F.2d 102 (7th Cir. 1958) .................................................................................14

*Clark v. Dashner*,
  No. 14-cv-965, 2016 WL 3621274 (D. N.M. June 30, 2016) ..................................18

*Collins v. Vill. of Palatine*,
  203 F.Supp.3d 952, 955 (N.D. Ill. 2016) ...............................................................14

*Comins v. Discovery Commc'ns, Inc.*,
  200 F.Supp.2d 512 (D. Md. 2002) .........................................................................24

*Counts v. Meriwether*,
  2015 WL 9594469 (C.D. Cal. Dec. 30, 2015) ........................................................21

iii

*Culver Franchising Sys. v. Steak n Shake Inc.*,
 No. 16-cv-72, 2016 WL 4158957 (N.D. Ill. 2016) ................................................16

*Design Basics, LLC v. Lexington Homes, Inc.*,
 858 F.3d 1093 (7th Cir. 2017) ................................................................14, 15, 17

*DiTocco v. Riordan*,
 815 F.Supp.2d 655 (S.D.N.Y. 2011).................................................................18

*Eaton v. Nat'l Broad. Co.*,
 972 F. Supp. 1019 (E.D. Va. 1997) ..................................................................23

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
 499 U.S. 340 (1991)..........................................................................................14

*Flaherty v. Filardi*,
 388 F. Supp. 2d 274 (S.D.N.Y. 2005)...............................................................21

*Fooey, Inc. v. Gap, Inc.*,
 2013 WL 2237515 (N.D. Ill. May 17, 2013) ....................................................18

*Franklin Mach. Prods. v. Heritage Foods Serv. Equip., Inc.*,
 No. 06-cv-379, 2007 WL 4287568 (N.D. Ind. 2007) ..................................16, 18

*Funky Films, Inc. v. Time Warner Entm't Co.*,
 462 F.3d 1072 (9th Cir. 2006) ........................................................18, 19, 20, 22

*Gaiman v. McFarlane*,
 360 F.3d 644 (7th Cir. 2004) ............................................................................23

*Gallagher v. Lions Gate Entm't, Inc.*,
 No. 15-cv-2739, 2015 WL 12481504 (C.D. Cal. Sept. 11, 2015) .......................21

*Gilbert v. New Line Prods., Inc.*,
 No. 09-cv-2231, 2009 WL 7422458 (C.D. Cal. Nov. 16, 2009) ...........................18

*Harris Custom Builders, Inc. v. Hoffmeyer*,
 874 F.Supp. 899 (N.D. Ill. 1995) ......................................................................18

*Hobbs v. John*,
 No. 12-cv-3117, 2012 WL 5342321, at *3 (N.D. Ill. Oct. 29, 2012) ...............16, 29

*Hogan v. DC Comics*,
 48 F. Supp. 2d 298 (S.D.N.Y. 1999)..................................................................23

*Hudson v. ACE Cash Express, Inc.*,
 No. 01-ip-1336, 2002 WL 1205060 (S.D. Ind. May 30, 2002) ............................14

*Incredible Techs., Inc. v. Virtual Techs., Inc.*,
    400 F.3d 1007 (7th Cir. 2005) ...............................................................17

*JCW Invs., Inc. v. Novelty, Inc.*,
    482 F.3d 910 (7th Cir. 2007) .................................................................17

*Jewel Music Publ'g Co. v. Leo Feist, Inc.*,
    62 F. Supp. 596 (S.D.N.Y. 1945) .........................................................14

*Jorgensen v. Epic/Sony Records*,
    351 F.3d 46 (2d Cir. 2003) .....................................................................15

*Kaplan v. Stock Mkt. Photo Agency, Inc.*,
    133 F.Supp.2d 317 (S.D.N.Y. 2001 ) ...................................................18

*Kouf v. Walt Disney Pictures & Television*,
    16 F.3d 1042 (9th Cir. 1994) ...........................................................27, 30

*Litchfield v. Spielberg*,
    736 F.2d 1352 (9th Cir. 1984) ...............................................................30

*Littel v. Twentieth Century Fox Film Corp.*,
    1995 WL 404939 (S.D.N.Y. July 7, 1995) ...........................................19

*Marquardt v. King*,
    No. 10-cv-3946, 2011 WL 5042054 (N.D. Ga. Aug. 10, 2011) .............18

*Muller v. Twentieth Century Fox Film Corp.*,
    794 F.Supp.2d 429 (S.D.N.Y. 2011) .....................................................21

*Newt v. Twentieth Century Fox Film Corp.*,
    No. 15-cv-2778, 2016 WL 4059691 (C.D. Cal. July 27, 2016) .............27

*Nichols v. Universal Pictures Corp.*,
    45 F.2d 119 (2d Cir. 1930) .....................................................................20

*O'Keefe v. Ogilvy & Mather Worldwide, Inc.*,
    590 F. Supp. 2d 500 (S.D.N.Y. 2008) ...................................................15

*Olson v. Nat'l Broad. Co., Inc.*,
    855 F.2d. 1446 (9th Cir. 1988) ....................................................23, 25, 28

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
    602 F.3d 57 (2d Cir. 2010) .....................................................................18

*Peters v. West*,
    692 F.3d 629 (7th Cir. 2012) .................................................................14

*Peters v. West*,
   776 F.Supp.2d 742 (N.D. Ill 2001) *aff'd* 692 F.3d 629 (7th Cir. 2012) ...........................16, 29

*Pino v. Viacom, Inc.*,
   No. 07-cv-3313, 2008 WL 704386 (D. N.J. Mar. 4, 2008) ....................................................18

*Randolph v. Dimension Films*,
   630 F.Supp.2d 741 (S.D. Tex. 2009) ...................................................................................18

*Risdon v. Walt Disney Prods.*,
   No. 83-cv-6595, 1984 WL 1181 (S.D.N.Y. Nov. 2, 1984)....................................................28

*Selle v. Gibb*,
   741 F.2d 896 (7th Cir. 1984) .........................................................................................14, 15

*Shame On You Prods., Inc. v. Banks*,
   120 F.Supp.3d 1123 (C.D. Cal. 2015) .................................................................................27

*Sheldon Abend Revocable Trust v. Spielberg*,
   748 F.Supp.2d 200 (S.D.N.Y. 2010).......................................................................19, 20, 21

*Silas v. Home Box Office, Inc.*,
   201 F.Supp.3d 1158 (C.D. Cal. 2016) ...........................................................................18, 27

*Tanksley v. Daniels*,
   259 F.Supp.3d 271 (E.D. Pa. 2017) ........................................................................18, 24, 25

*Theotokatos v. Sara Lee Pers. Prods.*,
   971 F. Supp. 332 (N.D. Ill. 1997) ..........................................................................14, 16, 29

*Tillman v. New Line Cinema Corp.*,
   295 Fed. App'x 840 (7th Cir. 2008) ....................................................................................18

*Tillman v. New Line Cinema Corp.*,
   No. 05 cv-0910, 2008 WL 687222 (N.D. Ill. Mar. 7, 2008)............................................16, 17

*TMTV, Corp. v. Mass Prods., Inc.*,
   645 F.3d 464 (1st Cir. 2011)................................................................................................19

*Walker v. Time Life Films, Inc.*,
   784 F.2d 44 (2d Cir. 1986)...................................................................................................24

*Wavelength Film Co. v. Columbia Pictures Indus.*,
   631 F.Supp. 305 (N.D. Ill. 1986) ........................................................................................17

*Wildlife Express Corp. v. Carol Wright Sales, Inc.*,
   18 F.3d 502 (7th Cir. 1994) .................................................................................................15

*Williams v. Crichton*,
    84 F.3d 581 (2d Cir. 1996)...................................................................14, 19, 24, 30

*Zella v. E.W. Scripps Co.*,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007) ...............................................................18

**Statutes**

Fed.R.Civ.P. 12(b)(6)...........................................................................................16

17 U.S.C. § 101 ......................................................................................................4

37 C.F.R. § 202.1(a)..............................................................................................29

# I.    INTRODUCTION

A comparison of Plaintiffs' works, each entitled *B&B If These Walls Could Talk* ("*B&B*"), and Defendants' television series *The Guest Book*, leads one to question whether Plaintiffs bothered to watch *The Guest Book* before bringing this $10,000,000 copyright infringement lawsuit.  Compl. at p. 13.[1]  The Court need do nothing more than review the works themselves to conclude that Plaintiffs' complaint should be dismissed.

The *B&B* works, on the one hand, and *The Guest Book*, on the other, are so unlike each other that they cannot possibly be deemed substantially similar within the meaning of the Copyright Act.  They are radically *dissimilar* in protectable expression – *i.e.*, in plot, theme, dialogue, mood, setting, pace, characters and sequence of events.  Plaintiffs' *B&B* is an upbeat, whimsical "dramedy" that delivers a positive message.  A lovely British widow inherits an elegant mansion on picturesque Martha's Vineyard, and converts it into a bed and breakfast.  Exercising a can-do attitude, she then successfully improves the lives of her guests.

Defendants' *The Guest Book*, by contrast, is a consistently dark comedy focused on the misfits who rent or squat-in one particular rustic, musty cabin in a fictional mountain town. Writing in the cabin's guest book, the occupants narrate their own respective madcap stories and adventures, including an unconscious atheist who is baptized without permission, an extortionate stripper, an Amish boy who is in love with Marcia Brady, a talking mouse and a drugged-up bear.

Plaintiffs' self-serving list of purportedly similar elements – consisting solely of mischaracterizations of the works themselves, manufactured comparisons and unprotectable elements – cannot create substantial similarity where none exists.  Consistent therewith, Plaintiffs'

---

[1] The plaintiffs are Diana Meynart-Hanzel and Michael David Slowik's (collectively, "Plaintiffs"), and the defendants are CBS Broadcasting Inc., Turner Broadcasting System, Gregory T. Garcia and Alix Jaffe (collectively, "Defendants").

claim fails for the independent reason that Plaintiffs have failed to allege sufficiently that any Defendant had access to any of Plaintiffs' B&B works.

Under the circumstances present here, where there is no access or substantial similarity of protectable expression, federal courts in the Seventh Circuit and across the country routinely dismiss copyright claims at the peading stage where. The Court should do the same here.

## II.    STATEMENT OF FACTS

### A.  Background

Plaintiffs' claim is premised on the notion that the first season of *The Guest Book* somehow infringes their three *B&B* works: namely their treatment (the "Treatment"), Sizzle Reel Video (the "Sizzle Reel") and Bible.  Brenner Decl., Exs. 1-3; *see also* Compl. ¶¶ 1-2, 18-21, 36-44.  In June of 2012, Plaintiffs first conceived of their *B&B* idea, but did not create these three works until 2013: (1) the Sizzle Reel was created "in 2013" and published to youtube.com on December 3, 2013; (2) the Treatment was created "in 2013"; and (3) the Bible was created "in December 2015." Compl. ¶¶ 19, 20, 22, 31; Exs. 1-3.[2]  5

Plaintiffs allegedly shared some of their *B&B* works with a variety of individuals between 2012 and 2015, none of whom are Defendants or even allegedly associated with Defendants.  (*Id.* ¶¶ 25, 27-29, 30-32.)   In addition to attending a "Pitch Fest" that did not involve any of the Defendants,[3] Plaintiffs also shared their works with someone named Lee Levinson in November 25, 2015, who also is not a defendant or even allegedly associated with any Defendant.  (*Id.* ¶¶ 30-32.)  Citing no facts, Plaintiffs offer the bare conclusion, made solely on information and belief,

---

[2] Plaintiffs also reference in the Complaint a video of character interviews of the main B&B characters (the "Character Interviews") they posted to youtube.com on October 5, 2013, but Plaintiffs' copyright infringement claim is not based on the Character Interviews.

[3] For example, Plaintiff Hanzel allegedly attended the "Fade in Magazine Pitch Fest" in Los Angeles in August 2014 and pitched Plaintiffs' idea "to about 10 companies," none of which are Defendants.  (Compl. ¶ 29.)

that Defendants must have accessed some or all of Plaintiffs' works, either because the Sizzle Reel is available on youtube.com, or because Mr. Levinson has *unspecified* "professional relationships in the television and motion picture industry" or one of the *unspecified* attendees of the August 2014 "Pitch Fest" shared Plaintiffs' works. *Id.* ¶¶ 33-35.

The first episode of Defendants' *The Guest Book* premiered on TBS on August 3, 2017. Compl. ¶¶ 18, 39. Over two weeks later, on August 18, 2017, Plaintiffs applied for copyright registration for their Treatment and Sizzle Reel for *B&B*. *Id.* ¶¶ 19-20; DE 1-3. Plaintiffs' copyright registration for the Bible is effective July 14, 2017. *Id.* ¶ 18; DE 1-1.

### B. The Abundance Of Entertainment Works Featuring Guests At A Rental Property And Ensuing Comedy

Prior to creation or publication of *any* of the works at issue here, entertainment works in many forms had long featured the basic plot idea of highlighting vacation rental properties, the ever-changing guests who rent such properties, and the resulting interactions which are often comedic. (*See generally* Defendants' Request for Judicial Notice ("RJN").) From television series such as *Newhart* (1982-83) and *Fawlty Towers* (1975), to films such as *The Happiness of the Katakuris* (2001) and *California Suite* (1978), to novels and plays like *The B&B Chronicles* (2010) and *Plaza Suite* (1969), one need not look very hard to find such stories. *Id.* at 3-8 (citing numerous other entertainment works).

Given the prevalence of other entertainment works which feature ever-changing guests at a vacation rental property, Plaintiffs cannot allege they own this idea. Rather, Plaintiffs lay claim only to their own version of this oft-used idea as expressed in their own works. Compl. ¶ 36.

### C. Plaintiffs' Three Works

Each of Plaintiffs three *B&B* works is an upbeat "dramedy" (*see* DE 1-2 (Bible) at 1; DE 1-3 (Treatment) at 2), revolving around innkeeper Lucy Ferrar, a positive, generous widow who

leaves the United Kingdom for America, where she transforms the problem-plagued guests who come to her B&B. In each *B&B* work,[4] the inn is a restored mansion located in upscale Martha's Vineyard, and was previously owned by Lucy's late husband. In each of Plaintiffs' works, every scene takes place only at the inn.

1.     **Work No. 1: The *B&B* Sizzle Reel (Brenner Decl., Ex. 1; Compl. ¶¶ 1, 2, 19)**

The Sizzle Reel opens with British Lucy and her bulldog, Betsy, sitting on the front step of a brick building with a dark brown, wood door, "waiting for the guests." Brenner Decl., Ex. 1 at 0:01-0:07. Immediately thereafter, the first guests arrive, beginning with a couple, one of whom is talking on a cell phone as she enters. *Id*. at 0:01-0:17. The title "B&B IF THESE WALLS COULD TALK" is shown over a lighthouse and shoreline. *Id*. at 0:17. Another guest couple enters a guest room called "Chalet" after which there are several views of a breakfast table, where Lucy serves the guests a dish she has prepared. *Id*. at 0:18-0:31. A series of brief clips featuring Lucy and various guests follow: guest Alex Glitch fumbles while introducing himself to other guests; another guest practices speaking Hebrew in front of a mirror; Lucy indulges in feeding a breast-shaped confection to Alex (both dressed in Greco-Roman attire, as she encourages him to taste her confection, which she calls her "nipple"); a couple is shown being amorous in bed with whipped cream; Lucy reads a Tarot card; a middle-aged man annoys another guest by playing guitar and singing loudly, and each of those narratives continues briefly and alternately, interspersed with clips of Lucy speaking directly to the viewer. *Id*. at 0:37-1:21. Next, a disco character starts a dance party at the inn, the separate narratives continue with brief snippets, and Lucy states into the camera, "If these walls could talk." *Id*. at 1:21-1:44.

---

[4] Although under the Copyright Act, "where the work has been prepared in different versions, each version constitutes a separate work," 17 U.S.C. § 101, Plaintiffs' three works are largely overlapping in content.

**2.      Work No. 2: The *B&B* Bible (Brenner Decl., Ex. 2; Compl. ¶¶ 1, 31, 36(e))**

The Bible has a hand-drawn picture of a building labeled "Chateaux La Vie" – a white building, surrounded by lush greenery, with a red door and roof, pink curtains, with people popping out of the windows. *Id*. at 1. The Bible describes *B&B* as "a half-hour dramedy" driven by the main character, Lucy Ferrar, a 42 year-old British woman, cultured, and newly widowed. *Id*. at 1-2, 5. Having lived in Britain all her life, Lucy moves into the mansion – located in the "colorful Gay Head cliffs of Aquinnah on the picturesque island of Martha's Vineyard" – after inheriting it from her late husband, to whom she often speaks. *Id*. at 2. To curtail her loneliness, Lucy transforms the mansion into a bed and breakfast in which she entertains various guests at the same time. *Id*. at 2-4. Lucy has a "zest for life" that she uses to solve her guests problems by "turn[ing] things around . . . for everyone that graces the steps of Chateaux La Vie" through fun experiences and valuable life lessons. *Id*. at 2. The episodes are seen through Lucy's eyes. *Id*. at 2.

The Bible introduces the show's other "Major and Supporting" characters who comprise Lucy's "piecemeal family": (i) Geronimo Garcia Ramirez Eli Arroyo Lopez a.k.a. "G," Lucy's "gardener by day and salsa instructor by night," age 47, "who brings more than flowers into her life," although the Bible does not explain what else he brings; (ii) Philomena Whitehall, Lucy's "crazy but loving" aunt, referred to as "Aunt Phil," age 80, whom Lucy adores and who lives in the inn; (iii) the handyman, Ludwig Von Ulm III, a.k.a. "Louie," a German-born composer/actor and a "Jack of All Trades and Master of None" in his seventies; and (iv) Pearl Tunstall, a.k.a. "Pea," Lucy's "nosey neighbor," age 35, who "befriends Lucy and lives vicariously through Lucy's zest for life." *Id*. at 2.

The Bible explains that "each week a new cast of characters arrive at the Chateaux La Vie," and provides a barebones plot summary for each of the show's twelve episodes:

- Episode 1 introduces the characters, and explains how Lucy came to open Chateaux La Vie. This episode features guests the Burgers, a couple who come to the inn to try to give their failing marriage "one more try." The Bible explains how the couple came to the inn but provides no details as to what happens after they arrive. Brenner Decl., Ex. 2 at 3.

- In Episode 2, Lucy, a talented baker, makes "medicinal brownies" for the local hippie, Moon Man, but inadvertently serves them to her guests, who "go out of their minds," with no further detail given. *Id*. at 3.

- In Episode 3, guest John Fig brings "a plethora of clichés," annoying the other guests. *Id*.

- In Episode 4, a gay couple on their honeymoon take salsa lessons from the gardener, Geronimo. *Id*.

- In Episode 5, two couples representing diametrically opposed political viewpoints visit the inn, leading to "explosive and satirical" dialogue at the morning breakfast table (although the Bible provides no actual dialogue). *Id*.

- In Episode 6, the handyman, Ludwig, fails to stifle his OCD compulsions, which are not described, "resulting in a comical interlude with Lucy and all the guests," but the interlude is not described. *Id*.

- In Episode 7, Aunt Phil's "aging mind get[s] the best of her," leading to "comical and odd behaviors" with Lucy and the guests, none of which behaviors are described. *Id*. at 4.

- In Episode 8, a sexually active couple's exploits leave Ludwig, the handyman, trapped in the lavatory while the couple "go[es] at it" in the adjoining bedroom, and Aunt Phil gets annoyed by the couple's behavior. *Id*.

- In Episode 9, the characters Gold and Levine, the not-Jewish couple seen in the Sizzle Reel, visit the inn only to each learn that the other lied about being Jewish. *Id*. at 4.

- In Episode 10, the struggling, third-generation comedian Alex Glitch shown in the Sizzle Reel, finds his "muse" in Lucy and, inspired by her beauty, kindness and charm, "is back on top of his game." *Id*

- In Episode 11, an 80s rock band comes to the inn to write new music for a reunion tour and decides they want Lucy to be their lead singer. *Id*.

- In Episode 12, during a torrential storm, someone who may be Jim Morrison, deceased lead singer of the Doors, arrives at the inn at midnight. *Id*.

The Bible also provides brief biographies of Plaintiffs and actors whom the creators suggest as potential cast members, none of whom appears in any of Plaintiffs' works or *The Guest Book*. Brenner Decl., Ex. 2 at 5-13.

### 3. Work No. 3: The *B&B* Treatment (Brenner Decl., Ex. 3; Compl. ¶¶ 1, 20)

There is a great deal of crossover between Plaintiffs' Treatment and the Bible and Sizzle

Reel, as the Treatment describes Lucy and Chateaux La Vie in a manner consistent with these works. The Treatment describes *B&B* as a light-hearted, explosive, "character-driven" sitcom, the episodes of which "end with a positive message." *Id*. at 2, 5.[5] The Treatment explains that the elegant inn is "one of the most beautiful properties on the island." *Id*. at 2. The Treatment further explains that Lucy "is a warm hearted buxom brunette" whose motto is "Life is Too Short so let's have some fun!," which she puts into practice by creating special activities for her guests such as yoga on the beach, a seductive cooking class, poetic improv, and tarot readings. *Id*. at 2-3.

The Treatment also reintroduces Betsy the bulldog and the guest characters Levine, Gold, Glitch and Ted and Paula Holmes, restating the basic plot lines with scant additional details: Levine, whose real name is Shamus O'Malley, is insecure, uses outdated humor, is irritating and callous, and takes Viagra; Gold's real name is Jennifer Morales, and she seeks a Jewish man to obtain "financial security"; Ted Holmes is a former electrical engineer battling depression and in a downward spiral, who hopes to write a song for his wife at the inn but "changes his tune in more ways than one" (none of which "ways" are described); Paula Holmes is selfless, but is suffering from a mid-life crisis and agreed to come to the inn only to "drop the bomb and end this dead-end relationship"; Alex Glitch has a twitch in his neck and eye. Brenner Decl., Ex. 3 at 3-4.

The Treatment also lists "Anchor Characters," most of whom are the "Major and Supporting" characters listed in the Plaintiff's Bible: gardener/groundskeeper Geronimo, handyman Louie (now named: Bohdan Krol), and Pearl Tunstall (now age 50, not 35). (Brenner Decl., Ex. 2 at 2; *see* Ex. 3 at 4.) Additional Anchor Characters are (1) Simone Vargas, Lucy's 62-year-old Mexican housekeeper, who is a former child star, and (2) Liliana Sanchez, Geronimo's

---

[5] For ease of reference, Defendants added page numbers to the bottom right corner of the copy of Plaintiffs' "Bible" attached as Exhibit 3 to the Brenner Declaration

17-year-old daughter, who never knew her mother and sees Lucy as a mother figure. *Id.* at 4. The Treatment lists – with no details– examples of guests at the inn: a vegetarian, biker, gay couple, homophobe, preacher, atheist, recovering alcoholic, Republican vs Democrat, fitness guru, newlyweds, type-A personality, yoga instructor, musicians, comedian and healer. *Id.* at 5. The Treatment also lists, mostly with one-word descriptions, uninvited guests who will appear at the inn: a burned out CEO, songwriter, drifter, magician, rock star, eccentric billionaire, writer, neurotic, bigot, amnesiac, fugitive and narcissistic movie star traveling incognito. *Id.*

### D.  Defendants' *The Guest Book* (Brenner Decl., Ex. 4)

*The Guest Book* is a dark comedy set in the rustic, fictional mountain town of Mount Trace. The series revolves around the Mount Trace Realty Vacation Cabin Rentals, which consists of many separate cabins. *E.g.*, Brenner Decl., Ex. 4 [Ep. 3 at 20:04]. The main story in each episode generally focuses on the new guests who occupy one such rustic cabin, "Froggy Cottage," although no episode takes place exclusively inside Froggy Cottage. Each episode has interconnected story arcs involving some of the "locals." Episodes 2 through 10 each begin with two young male employees at a computer store meeting at a vending machine. Unrelated to the main story, one tries to convince the other to watch *The Guest Book* by summarizing prior episodes while highlights from the series are shown. This is followed by the opening credits. Each episode ends with a musical performance by a folk rock duo.

"Story One" of *The Guest Book* is narrated by young science teacher Tim, who describes his stay at Froggy Cottage while writing his story into the cabin's guest book. *Id.*, Ex. 4. Tim and his wife, Sandy, escape to Froggy Cottage for the weekend so Sandy can get a break from their baby and some much-needed rest. *Id.* at 1:53. After driving to another town, Winksville, to purchase a new humidifier for his wife, Tim visits the local strip club, Chubbys Bikini Bar, and a heavyset blonde stripper named Vivian (professionally known as Tickles) invites Tim to the "VIP

room," which is actually a storage closet. *Id*. at 5:44-9:39. Vivian's stripper routine includes running her bare foot across Tim's face, and although Tim refuses to provide details about his VIP room adventure, he states that it "involved feet and [he is] not proud of it." *Id*. at 9:55-10:50. Vivian's stepson Frank then uses a videotape of Tim's visit to the VIP room in order to try to blackmail Tim. *Id*. at 11:00-11:50. Tim destroys the videotape without his wife Sandy finding out about it, locks Frank in his own car trunk, and the couple has an enjoyable weekend, which includes amorous escapades. *Id*, at 13:30-15:30, 17:32-19:50. Story One also introduces Wilfred and Emma, an older, married couple who manage the rental properties, and the man living next door to Froggy Cottage (Dr. Andrew Brown), who is divorced and has shared custody of his son. *Id*. at 6:23-6:49; 21:00-22:08; 14:07-14:16.

"Story Two" is narrated by middle-aged, veterinary nurse Jill as she confesses the details of her stay at Froggy Cottage to her priest. *Id*. at 2:55-3:18. Jill and her husband, devout Catholics, bring their son and future daughter-in-law Lynn to Froggy Cottage as part of Jill's plot to drug and secretly baptize Lynn, who is an atheist. *Id*. at 3:19-3:35, 6:00-7:33. Jill is able to execute her plan using the anesthetic Propofol, but Lynn lands in the hospital with an infection. *Id*. at 7:36-7:55, 8:48-9:52, 13:30-13:55. Upon her release, Lynn explains to Jill that she found God during her hospital stay – while the dillusioned Jill renounces her faith. *Id*. at 17:40-20:25. The viewer also learns that Wilfred winds up at Chubbys, while Dr. Brown struggles through an antagonistic relationship with his ex-wife. *Id*. at 5:41, 14:10; 21:45.

"Story Three" is narrated by Phyllis as she writes in the Froggy Cottage guest book about "something crazy" that happened. *Id*. at 2:55. Phyllis and her husband treat her husband's boss David and his new wife to a vacation in the mountains. *Id*. at 3:05. In the middle of the night, Phyllis answers the ringing phone inside Froggy Cottage, and as the disoriented/drunk David

urinates on the floor, Phyllis helps the caller, Marcia, escape a polygamous marriage by wiring her money. *Id*. at 7:56, 8:50-9:55. Meanwhile, Vivian makes a videotape of her stripper encounter with Wilfred, but Frank refuses to blackmail the older man. *Id*. at 3:58, 5:20, 13:08-14:00. After learning that Wilfred manages the Mount Trace rentals, Vivian hatches a money-making scheme and is even more determined to blackmail him. *Id*. at 13:24-14:00 21:13. Meanwhile, Dr. Brown is having difficulty connecting with his son. *Id*. at 6:47, 10:50, 13:24-14:00, 21:10.

"Story Four" is narrated by Christy, who writes her story into the Froggy Cottage guest book as she hides in a storage space beneath the stairs. *Id*., Ex. 4 at 3:05-4:02. Christy is vacationing with her boyfriend and his child Glenda – neither of whom know that Christy is a former porn star and recovering drug addict. Her goal is to get to know the daughter and prove that she is the "perfect woman." *Id*. at 4:02, 6:10-8:34. Her plans are nearly derailed when the child catches Christy eating pot brownies from a dispensary and, thinking they are regular brownies, asks to share them. *Id*. at 8:38-9:28. Panicking, Christy shoves all three brownies in her mouth, leading to wild hallucinations featuring a talking mouse in the storage space where Christy hides while waiting for the pot to wear off. *Id*. at 9:14, 10:33-11:54, 15:50-16:13. Luckily, the talking mouse helps Christy tell the child an entertaining story, allowing the two to forge a connection. *Id*. at 18:17-20:00. Christy's disappearance (she has stayed hidden for a long time) leads to a police investigation during which her boyfriend learns she was a porn star. *Id*. at 17:05-18:04. Christy is found and confesses her entire story at a local AA meeting, earning her boyfriend's forgiveness. *Id*. at 20:37-21:07. Separately, Vivian plans to use the videotape of Wilfred to blackmail him into letting her rent out cottages and collect the money. (*Id*. at 4:50.) Concurrently, Dr. Brown hopes to get back together with his wife, and Officer Leahy, a local police officer, may be interested romantically in Dr. Brown. *Id*. at 12:48, 16:30.

"Story Five" is narrated by Dr. Laurie Galiff who presents the results of her recent study on "Alzheimer's Reimmersion Therapy" to a medical board. *Id*., Ex. 4 at 2:27. Her experimental program helps dementia patients regain "some sense of who they once were" by "revisit[ing] the past."(*Id.* at 2:40. With the assistance of an African-American nurse, Darnell, Galiff tests the program on Edgar Barns, an elderly Alzheimer's patient, whom they take to Froggy Cottage, which closely resembles his old house. *Id.* at 3:20-4:22. The program succeeds in restoring Barns to his former self – which was "a racist, murdering, spousal-abusing misogynistic, reprehensible, irredeemable son-of-a-bitch" who once burned down a Methodist church. *E.g., id.* at 14:49-16:07, 17:59-19:45) After learning of Barns' checkered past, Galiff and Darnell find Barns in the closed garage with the car running and decide not to save him. *Id.* at 20:19-59. Meanwhile, Officer Leahy is disappointed to learn that Dr. Brown wants to reconcile with his wife, and Frank blackmails Wilfred using the tape of Wilfred in the Chubbys VIP room and demands that Wilfred give him the keys to Froggy Cottage. *Id.* at 6:46-7:33, 22:40-57.

"Story Six" is narrated by Blake, who tells his tale involving Froggy Cottage to a bartender at a Mexican cantina. *Id*., Ex. 4 at 2:38-3:10. Blake, a gigolo poet/scam artist whose girlfriend was connected to a Columbian drug cartel, is holed up with federal agent Trina in Froggy Cottage while waiting to testify against the cartel. *Id.* at 3:40-4:50. Plotting to escape with a suitcase full of drug money, Blake temporarily falls for Trina. *Id.* at 10:20-15:40, 16:51-20:13. Once he is free, Blake has second thoughts and ditches Trina, who tracks him to the Mexican cantina and has him arrested. *Id.* at 20:25-21:00. Blake and Trina booked their stay at Froggy Cottage through Vivian as part of her blackmail scheme. *Id.* at 5:45-6:30. Meanwhile, Dr. Brown's plan to reconcile with his wife backfires when she brings a date. *Id.* at 8:11-8:51.

"Story Seven" is told by Adam as he writes his story into the Froggy Cottage guest book. *Id*., Ex. 4 at 2:45-3:13. Adam, an accountant who "loves to count," tries to lure a co-worker to Froggy Cottage for a "surprise date" by inviting her to a fake party at the cabin. *Id.* at 2:46-4:30. When she brings a date, Adam is forced to bribe the locals to attend his now-real party. *Id.* at 11:48-15:25. In the end, a number-loving woman who seems like the perfect match for Adam shows up at Froggy Cottage, but Adam dismisses her as a "weirdo" as he closes the door on her. *Id*. at 21:09-22:22. Meanwhile, Wilfred is teaching himself line dancing, his wife Emma's hobby, and Officer Leahy gives Dr. Brown her phone number. *Id.* at 22:28-22:43.

"Story Eight" is told by Tommy as he writes in the Froggy Cottage guest book. *Id*., Ex. 4 at 2:19. Tommy brings his girlfriend, Marla, to the mountains to try to break her meth addiction. *Id.* at 4:28. The couple sneaks into Froggy Cottage, where Tommy dumps Marla's drugs down the toilet and into the kitchen sink, despite her violent protest. *Id.* at 6:28-8:31, 10:31, 17:17. The two tussle until a bear interrupts, devours what remains of the crystal meth in the sink and goes on a rampage, after which Marla swears off drugs and proposes to Tommy. *Id.* at 19:15-20:15, 20:23. Meanwhile, Dr. Brown is hesitant to date Officer Leahy, but she interrupts his crossbow practice to make her feelings clear. *Id.* at 4:58-6:20, 9:20. She learns that Dr. Brown feels guilty because his marriage fell apart after his wife's friend discovered he had set up a Tinder account even though he hadn't actually met anyone. *Id.* at 10:00, 10:54-12:00. Officer Leahy proves to Dr. Brown that his wife had a Tinder account before he did and most likely discovered his account herself, and, grateful, he agrees to go on a date with Leahy. *Id.* at 17:56-19:15.

"Story Nine" is told by Jacob as he writes his story in the guest book. *Id*., Ex. 4 at 2:21. Jacob, an Amish teenager, is on his coming-of-age Rumspringa – when Amish teens go "into the world to experience things [that] are forbidden." *Id.* at 2:55. He rents Froggy Cottage where,

misunderstanding God's plan, he tries several times to kill himself, then sees television for the first time, falls in love with Marcia from *The Brady Bunch*, and is convinced that God wants the two to be together. *Id.* at 5:51-7:07, 15:55-16:42. He meets Maureen McCormick who has aged since portraying Marcia decades ago and who regularly receives visits from Amish teens on their Rumspringa. *Id.* at 21:21. Concurrently, after Wilfred destroys the blackmail tape Frank gave him, Vivian tries to talk to Emma, but Dr. Brown shoots a crossbow bolt through Vivian's breast. *Id.* at 12:10, 15:05, 19:03-20:37. Brown and Officer Leahy go on their first date, and Leahy spends the night at Dr. Brown's cabin. *Id.* at 14:16, 18:26.

Unlike the prior episodes, "Story Ten" has no narrator or new guests. *See id.* Ex. 4. Wilfred and Dr. Brown kidnap the wounded Vivian (crossbow bolt still sticking out of her breast) and hold her inside Froggy Cottage. *Id.* at 2:50. Dr. Brown rushes Officer Leahy off so he can get medical supplies for Vivian. *Id.* at 4:07 After he returns, his ex-wife drops off their son. With Vivian gagged and tied to a chair inside Froggy Cottage, Wilfred returns to the rental office and Dr. Brown asks Leahy to watch his son. *Id.* at 10:07, 11:43. Leahy eventually discovers and details Vivian, Dr. Brown and Wilfred. *Id.* at 15:59. To clear her beloved, Leahy contacts all the previous guests to confirm Wilfred's claim that Vivian is an extortionist. *Id.* at 15:59, 16:33, 18:28. After Tim from Story One confirms that Vivian tried to blackmail him, Vivian agrees to forgive, or at least forget, the crossbow wound and abduction. *Id.* at 19:55. In the end, Leahy, Brown and his son share ice cream, and Wilfred and Emma go line dancing together as Emma reveals that she knew all along he had been going to the Chubbys stripclub. *Id.* at 21:20, 21:32, 22:09.

## III. PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED

### A. The Applicable Legal Standards For Copyright Infringement

To maintain a claim for copyright infringement, a plaintiff must be able to establish both (1) ownership of a valid copyright and (2) that defendant copied elements of the work that are

subject to copyright protection. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017). To establish the second element above, a plaintiff must show both that the defendant had access to her work, and that the two works are substantially similar in those elements which are protected by the Copyright Act. *Peters v. West*, 692 F.3d 629, 633 (7th Cir. 2012); *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996).

In ruling on a motion to dismiss, the Court should accept all factual allegations as true, but it need not accept as true allegations that are contradicted by documents referenced in the complaint or matters subject to judicial notice. *Hudson v. ACE Cash Express, Inc.*, No. 01-ip-1336, 2002 WL 1205060, at *3 n.1 (S.D. Ind. May 30, 2002); *Collins v. Vill. of Palatine*, 203 F.Supp.3d 952, 955 (N.D. Ill. 2016). "[T]he works themselves supersede and control any contrary allegations, conclusions or descriptions of the works as contained in the pleadings." *Theotokatos v. Sara Lee Pers. Prods.*, 971 F. Supp. 332, 340-41 (N.D. Ill. 1997)

Here, Plaintiffs' Complaint should be dismissed on two independent grounds: (1) Defendants had no access to Plaintiffs' works, and (2) the works are not substantially similarity.

### B. Plaintiffs Conclusory Allegations Of Access Are Insufficient As A Matter Of Law

To satisfy the access requirement, a plaintiff must show that the copyrighted work was "sent directly to the defendant . . . or a close associate of the defendant," or that that the copyrighted work was so widely disseminated that the defendant can be presumed to have seen it." *Design Basics*, 858 F.3d at 1099-1100; *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984).[6] Establishing a

---

[6] Such widespread dissemination is shown, for example, where plaintiffs distributed 2,000 copies of sheet music and sold more than 200,000 records, and their song was broadcast nationwide for years (*Cholvin v. B. & F. Music Co.*, 253 F.2d 102, 103-04 (7th Cir. 1958), but is not shown where almost 10,000 copies of the complaining song were sold or distributed and the music had been broadcast on national performances. *Jewel Music Publ'g Co. v. Leo Feist, Inc.*, 62 F. Supp. 596, 598 (S.D.N.Y. 1945).

"bare possibility of access" is insufficient; a plaintiff must prove that "a defendant had a reasonable possibility of viewing the work." *Design Basics*, 858 F.3d at 1107 (quotations omitted). Thus, to support a finding of access, "plaintiffs' evidence must extend beyond mere speculation or conjecture." *Selle*, 741 F.2d at 902. "Applying this doctrine, courts have consistently refused to treat internet publication alone as sufficient to engender this requisite possibility," even on a "public" and "user-friendly" website. *Design Basics*, 858 F.3d at 1107, 1108 (citing authorities); *Briggs v. Blomkamp*, 70 F.Supp.3d 1155, 1167 (N.D. Cal. 2014) (posting drafts of a screenplay on a website fails to "show wide dissemination sufficient to support an inference that defendants had access to his work"); *O'Keefe v. Ogilvy & Mather Worldwide, Inc*., 590 F. Supp. 2d 500, 515 (S.D.N.Y. 2008) ("[T]he mere fact that [plaintiff's] work was posted on the internet prior to the creation of defendants' work is insufficient by itself to demonstrate wide dissemination."). Unsubstantiated allegations that a plaintiff sent her work to someone who may have played a role in the alleged infringement due to their "association and affiliation" in the entertainment industry cannot establish access. *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 49 n.2 (2d Cir. 2003).

Plaintiffs' allegations of access are insufficient to state a claim as a matter of law. They merely speculate that Defendants somehow accessed their works because Plaintiffs shared them with a variety of individuals between 2012 and 2015, none of whom are Defendants or are even allegedly associated with Defendants. Compl. ¶¶ 33-35. Courts routinely deem this type of speculation and conjecture about access wholly insufficient to support a copyright claim.

### C. A Side-By-Side Comparison Reveals That There Is No Substantial Similarity Between Any Protectable Elements In Plaintiffs' Works And *The Guest Book*

In the Seventh Circuit, when the copyrighted work and the alleged infringement are both before the court, courts should conduct a "side-by-side" or "ocular comparison' . . . of the works being analyzed for similarity." *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502,

506-07 n.1 (7th Cir. 1994); *see also Culver Franchising Sys. v. Steak n Shake Inc.*, No. 16-cv-72, 2016 WL 4158957, at *8 (N.D. Ill. 2016) ("[T]his court may – and, indeed, must – evaluate substantial similarity in determining whether dismissal is warranted under Rule 12(b)(6)."). *Hobbs v. John*, No. 12-cv-3117, 2012 WL 5342321 n.3, at *3 (N.D. Ill. Oct. 29, 2012) ("Because the test for substantial similarity is an objective test, district court may determine copyright infringement claims at the motion to dismiss stage of litigation") (citing *Peters v. West*, 776 F.Supp.2d 742 (N.D. Ill 2001) *aff'd* 692 F.3d 629 (7th Cir. 2012).[7]

Accordingly, courts within the Seventh Circuit frequently dismiss copyright infringement claims at the pleading stage after comparing the works at issue and determining that they share no substantial similarity of protectable expression. *Theotokatos*, 971 F. Supp. at 340-41; *Franklin Mach. Prods. v. Heritage Foods Serv. Equip., Inc.*, No. 06-cv-379, 2007 WL 4287568, at *2-6 (N.D. Ind. 2007); *Hobbs*, 2012 WL 5342321 at *9 n.3; *Peters*, 776 F.Supp.2d 742.

"Substantial similarity is determined through the objective 'ordinary observer' test by asking 'whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value.'" *Tillman v. New Line Cinema Corp.*, No. 05 cv-0910, 2008 WL 687222, at *7 (N.D. Ill. Mar. 7, 2008) (quoting *Wildlife Express*, 18 F.3d at

---

[7] "[I]n deciding a Rule 12(b)(6) motion, a court may consider documents attached to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to his claim.'" *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)). "[I]f a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment," thereby "prevent[ing] a plaintiff from 'evad[ing] dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that prove[s] his claim has no merit.'" *Brownmark*, 682 F.3d at 690 (quoting *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002)). Thus, the Court can consider Plaintiffs' works and the episodes of *The Guest Book* in ruling on this motion.

509); *see also JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 916 (7th Cir. 2007) ("The test for substantial similarity is an objective one").

In applying the ordinary observer test, the Court must first filter out and disregard unprotectable elements, such as stock ideas, concepts, situations and incidents that flow naturally from general plot lines (often referred to as "scènes à faire"). *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1012 (7th Cir. 2005) ("'incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic' . . . are not protectible by copyright") (quoting *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 616 (7th Cir. 1982). Such a step is necessary because stock situations, characters and themes that exist in previously published works are too common and generic to merit copyright protection. *See Wavelength Film Co. v. Columbia Pictures Indus.*, 631 F.Supp. 305, 307 (N.D. Ill. 1986) (finding plaintiff's premise of "an alien trying to return home [being] pursued by hostile governmental authorities and rescued by friendly humans" and the attendant characteristics "indispensable elements to the treatment of this type of science fiction theme and are, as a matter of law, simply too general to be protectible"); *Tillman*, 2008 WL 687222, at *7-9 (the court must "eliminat[e] the unprotectable general ideas and scènes à faire").

After filtering out and disregarding the unprotectable elements, the Court must inquire only whether the protectable elements, standing alone, are substantially similar. *Design Basics*, 858 F.3d at 1101 ("When considering substantial similarity, it is essential to focus on *protectable* expression.") (emphasis in original). Because "copyright protection extends only to the particular expression of an idea and never to the idea itself," substantial similarity is measured at the level of the concrete elements of each work, rather than at the level of the "general theme" basic idea, or story, that it conveys." *JCW*, 289 F.Supp.2d at 1035-36; *Tillman*, 2008 WL 687222, at *7-9.

A court may dismiss a copyright infringement claim on a 12(b)(6) motion if it concludes that no reasonable jury could find that the works are substantially similar, or if it concludes that the similarities between the two works pertain only to unprotected elements of the works. *Franklin*, 2007 WL 4287568, at *2; *Fooey, Inc. v. Gap, Inc.*, 2013 WL 2237515, at *3-4 (N.D. Ill. May 17, 2013) (granting 12(b)(6) after "conclud[ing] that no ordinary observer comparing the two [works] could reasonably conclude that defendant misappropriated plaintiff's protectable expression"); *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1131 (C.D. Cal. 2007); *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63-64 (2d Cir. 2010). Moreover, where any similarities between the works are far outweighed by the significant differences, dismissal of the copyright claim is appropriate as a matter of law. *Harris Custom Builders, Inc. v. Hoffmeyer*, 874 F.Supp. 899, 903 (N.D. Ill. 1995), *rev'd on other grounds*, 92 F.3d 517 (7th Cir. 1996); *see also Gilbert v. New Line Prods., Inc.*, No. 09-cv-2231, 2009 WL 7422458, at *3-5 (C.D. Cal. Nov. 16, 2009) (granting 12(b)(6) concerning movie where the generic similarities "pale[d] … in comparison to vast differences in characters, plot, mood, and themes between the two works"); *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1078-81 (9th Cir. 2006).[8]

As applied to literary and audiovisual works, the test for substantial similarity focuses on articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events of the works. *Tillman v. New Line Cinema Corp.*, 295 Fed. App'x 840, 842-

---

[8] Courts across the country routinely dismiss – at the pleading stage – copyright infringement claims regarding entertainment works after evaluating the works themselves and concluding that no substantial similarity exists. *See, e.g., Silas v. Home Box Office, Inc.*, 201 F.Supp.3d 1158, 1171-1183 (C.D. Cal. 2016); *Zella*, 529 F. Supp. 2d at 1130; *DiTocco v. Riordan*, 815 F.Supp.2d 655, 666-673 (S.D.N.Y. 2011); *Tanksley v. Daniels*, 259 F.Supp.3d 271, 280-96 (E.D. Pa. 2017); *Pino v. Viacom, Inc.*, No. 07-cv-3313, 2008 WL 704386, at *3-9 (D. N.J. Mar. 4, 2008); *Randolph v. Dimension Films*, 630 F.Supp.2d 741, 745-49 (S.D. Tex. 2009); *Brown v. Twentieth Century Fox Home Entm't*, 14-cv-147, 2015 WL 5081125, at *9-13 (E.D. Ky. Aug. 27, 2015); *Clark v. Dashner*, No. 14-cv-965, 2016 WL 3621274, at *5-14 (D. N.M. June 30, 2016); *Marquardt v. King*, No. 10-cv-3946, 2011 WL 5042054, at *3-8 (N.D. Ga. Aug. 10, 2011); *Kaplan v. Stock Mkt. Photo Agency, Inc.*, 133 F.Supp.2d 317, 326 (S.D.N.Y. 2001 ).

43 (7th Cir. 2008) (citing *Funky Films*, 462 F.3d at 1078-81 & *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823-25 (9th Cir. 2002)); *see Williams v. Crichton*, 84 F.3d 581, 595 (2d Cir. 1996).

Here, the requisite comparison of the *B&B* works, on one hand, and *The Guest Book*, on the other hand, leads to the inevitable conclusion that the works are dramatically different and cannot form the basis of a viable claim for copyright infringement.

### 1. There is No Similarity in Plot.

"General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985); *Cabell v. Sony Pictures Entm't, Inc.*, 714 F.Supp.2d 452, 458-59 (S.D.N.Y. 2010); *see TMTV, Corp. v. Mass Prods., Inc.*, 645 F.3d 464, 469 (1st Cir. 2011). When analyzing whether two plots are substantially similar, courts are required to look "beyond the vague, abstracted idea of a general plot" and instead focus on "the objective details of the works." *Berkic*, 761 F.2d at 1293 (citing *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)); *see Littel v. Twentieth Century Fox Film Corp.*, 1995 WL 404939, at *14-15 (S.D.N.Y. July 7, 1995) (considering "concrete details of each work" rather than general plot idea in finding no substantial similarity in plot).

Casebooks are full of situations, like this one, where plaintiffs have tried – and failed – to premise a copyright claim on a general plot idea. *See, e.g.*, *Berkic*, 761 F.2d at 1293 (plot of "criminal organizations that murder healthy young people, then remove and sell their vital organs to wealthy people in need of organ transplants" and "the adventures of a young professional who courageously investigates, and finally exposes, the criminal organization" not protected because "[n]o one can own the basic idea for a story"); *Funky Films*, 462 F.3d at 1081 (general plot idea of "[a] family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business" is not protected); *Sheldon Abend Revocable Trust v. Spielberg*, 748 F.Supp.2d 200, 208 (S.D.N.Y. 2010) (plot idea of a " male protagonist, confined

to his home, who spies on neighbors to stave off boredom and, in so doing, discovers that one of his neighbors is a murderer," where the male protagonist "is himself discovered by the suspected murderer, is attacked by the murderer, and is ultimately vindicated" not protectable). Simply put, a plaintiff can have no "monopoly" over a general plot idea. *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 122 (2d Cir. 1930).

Here, Plaintiffs lay claim to the plot idea of "new 'guests' arriv[ing] at the home each week and the story unfolds around the humorous 'reality-TV style' interactions between the guests." Compl., ¶ 36(k). It is well-established, however, that even if the Court were able to find such a plot in *The Guest Book*, such a general plot idea is not protectable as a matter of law. *Berkic*, 761 F.2d at 1293; *Funky Films*, 462 F.3d at 1081; *Abend*, 748 F.Supp.2d at 208; *Nichols*, 45 F.2d at 122. Indeed, countless prior entertainment works have focused on the interactions with and between guests at vacation rental properties, and the humor that ensues. RJN at 3-5.

Separately, the actual, expressed plots of the *B&B* works and *The Guest Book* are wildly dissimilar. *B&B* is an upbeat, optimistic "dramedy" taking place in an upscale, luxurious mansion turned bed and breakfast – one of the most beautiful properties on picturesque Martha's Vineyard. Its core story, seen through the eyes of the inn's lovely, upbeat British owner, Lucy, focuses on Lucy's ability to solve her guests' problems, often by arranging special activities through which guests can, and do interact, and to send her guests home changed for the better, all while delivering a positive message to the viewer.

*The Guest Book*, in contrast, is a dark comedy, devoid of drama, focused on the guest(s) inhabiting only one of many rental cabins, Froggy Cottage, a rustic cabin which, while tidy, "smells dusty, rusty or musty," and features outdated electronics, cheap macramé, and a broken toilet. Its core story is told by a new character each episode: one particular guest inhabiting Froggy

20

Cottage who never interacts with guests vacationing in another cottage while engaging in conduct ranging from morally ambiguous to criminal.

## 2.      There is No Similarity in Setting.

The fact that *portions* of competing works take place in some sort of rental property is too general to be protectable.  *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 288-89 (S.D.N.Y. 2005) (finding "the fact that both [films] contain scenes set in a law office" "too general to be protectible"); *Muller v. Twentieth Century Fox Film Corp.*, 794 F.Supp.2d 429, 446-47 (S.D.N.Y. 2011) (the fact that competing works primarily set in or near Antarctica, both using underground pyramid and archeological excavation settings, "far too general to be the basis of a copyright infringement action"); *Counts v. Meriwether*, 2015 WL 9594469, at *13-14 (C.D. Cal. Dec. 30, 2015) (settings of "a living room with an L-shaped couch and television, as well as in a bar . . . are not protectable" are "stock settings that are not protectable").

The settings of competing works are not substantially similar where, as here, the works take place in different parts of the country, are different types of buildings and are, frankly, not alike.  *Gallagher v. Lions Gate Entm't, Inc.*, No. 15-cv-2739, 2015 WL 12481504, at *9-10 (C.D. Cal. Sept. 11, 2015) ("'[b]eyond the basic premise of a [remote cabin], there are no similarities in the setting' of" competing works where one cabin set in a "massive," "fully equipped" estate in Flagstaff, Arizona, while the other cabin set in a "run-down and creepy cabin" with "disturbing artwork"); *Abend*, 748 F.Supp.2d at 209-10 (no similarity where "*Disturbia* is set in a house in suburban California while the Short Story is set in an apartment in New York City"); *A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 487 F.Supp.2d 41, 50 (D.Conn. 2007) (no similarity where plaintiff's work set "in slightly sketchy New York City venues," while defendants' work "primarily set at a fancy hotel in the Hamptons").  There can be no similarity in the settings of competing works where the expressions of the settings are vastly different.  *Funky Films*, 462 F.3d

at 1080 (finding no substantial similarity where both works took "place in a contemporary, family run funeral home," but in the defendants' work the setting was "a well-maintained funeral home" whereas the plaintiffs' funeral home was "in shambles").

Here, as a viewing of the works makes clear, the actual settings are wholly different. The *B&B* works take place exclusively within the luxurious walls of Chateaux La Vie, an elegant mansion that was converted to a bed and breakfast and is one of the most beautiful properties on picturesque Martha's Vineyard.

By contrast, no single episode of *The Guest Book* takes place exclusively at Froggy Cottage, a rusty/dusty/musty rental log cabin. Indeed, *The Guest Book* takes place in numerous locations other than Froggy Cottage, including: the Mount Trace rental office, Chubbys Bikini Bar, the Mount Trace General Store, a coffee shop, the Mount Trace Community Church Activity Center, an ice cream store, a hospital in Mount Trace, a school classroom, a church and its confessional booth, a conference room for a medical board meeting, a Mexican cantina, a sewing machine company's accounting office, a trailer park, portions of Amish country, a retirement home and a Mexican drug dealer's home.

Additionally, *The Guest Book*'s primary setting is the fictional, rustic mountain town of Mount Trace, a far cry from the picturesque, real-life island of Martha's Vineyard. There is no similarity between Froggy Cottage and Chateaux La Vie beyond the fact that both have four walls and guests. Froggy Cottage is a typical wood cabin that looks nothing like either the brick building version of Chateau La Vie from the Sizzle Reel, or the white and red version of Chateau La Vie in Plaintiffs' Bible that has people popping out of the windows. In stark contrast to Chateaux La Vie's elegance, Froggy Cottage "smells dusty, rusty or musty," has "the world's first microwave,"

an "old-as-hell combination TV/VCR," and myriad ceramic frog statuettes. Brenner Decl., Ex. 4 [Story One].

### 3.     There is No Similarity in Characters.

Copyright law provides very limited protection to characters presented in a creative work; basic or stock character types are not copyrightable. *Eaton v. Nat'l Broad. Co.*, 972 F. Supp. 1019, 1027-29, n. 16-17 (E.D. Va. 1997) (ideas of a "cute" and "precocious" six-year old African American boy or a humorous, corpulent character are not especially distinctive and not protectable); *Gaiman v. McFarlane*, 360 F.3d 644, 659-60 (7th Cir. 2004) ("stock character[s]" such as a drunken old bum, "a drunken suburban housewife, a gesticulating Frenchman, a fire-breathing dragon, a talking cat, a Prussian officer who wears a monocle and clicks his heels, a masked magician," and "a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress" are "stereotyped characters" which are not the product of "the creative imagination but of simple observation of the human comedy."); *Hogan v. DC Comics*, 48 F. Supp. 2d 298 (S.D.N.Y. 1999) (finding no substantial similarity between two young, male, similar-looking half-vampire characters named Nicholas Gaunt both of whom experienced flashbacks in their quest to discover their origins, and became killers); *Alexander v. Murdoch*, No. 10-cv-5613, 2011 WL 2802923, at *5 (S.D.N.Y. July 14, 2011) ("stunningly beautiful, fiery, temperamental, Latina mother, with a thick accent, who's in love with her Caucasian [ex-husband/husband] and always makes him do the right thing, especially where her son is concerned . . . is a stock character and therefore not copyrightable").

The less developed the characters, the less they can be copyrighted. *Becker v. Loew's, Inc.*, 133 F.2d 889, 892 (7th Cir. 1943); *Culver*, 2016 WL 4158957, at *7. Only those characters, such as "Mickey Mouse" or "Superman," which are "especially distinctive" receive copyright protection and may form the basis of an infringement claim. *Olson v. Nat'l Broad. Co., Inc.*, 855

F.2d. 1446, 1451-52 (9th Cir. 1988); *Tanksley v. Daniels*, 259 F.Supp.3d 271, 290-91 (E.D. Pa. 2017). Characters which are standard in the treatment of a given topic or are "familiar figure[s]" are also not protectable. *Comins v. Discovery Commc'ns, Inc.*, 200 F.Supp.2d 512, 520 (D. Md. 2002); *Williams*, 84 F.3d at 588.

When comparing characters, courts must consider the totality of character attributes and traits, and their total concept and feel. *See Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986). Other than both works including characters who are vacationing guests, the *B&B* works and *The Guest Book* have no similarity, let alone substantial similarity, between any individual characters. Plaintiffs' main character – Lucy, a 42-year old, Caucasian, British inn owner who is a warm hearted, buxom, intelligent and cultured brunette, creates special activities for all her guests and talks to her late husband – has no corollary character in *The Guest Book*.[9] *The Guest Book's* Wilfred and Emma, the cynical older, married, African American couple who manage, clean and maintain the Mount Trace cabins, do not own the cabins, nor is the cabins' owner ever revealed. Brenner Decl., Ex. 4 [Story 3] at 13:24-14:00 (Wilfred "works at that rental place, rents cabins for the owners, gives people the keys") (emphasis added).

Additionally, the core characters in *B&B* are employees at Chateaux La Vie or Lucy's family/neighbors: (1) Geronimo, a gardener by day/salsa instructor by night in his late forties; (2) Aunt Phil, Lucy's crazy but loving 80-year-old aunt who lives in the inn; (3) handyman Louie/Bohdan, a German-born composer/actor in his seventies with OCD; (4) Pearl, Lucy's nosy neighbor who lives vicariously through Lucy; (5) Simone, a 62-year-old Mexican housekeeper

---

[9] Plaintiffs' comparison of Lucy to Phyllis from Story Three of *The Guest Book* (Compl. ¶¶ 36(g)-(i); DE 1-5, at 4) is ridiculous. Defendants' Phyllis is not the "female protagonist" and central character of *The Guest Book* (*see* Compl. ¶¶ 36(g), (h)); rather, she is a guest who stays in Froggy Cottage in one particular episode thereof. She is not an "anchor character," does not own an inn which she "lovingly open[s]" to guests, is married and has no deceased husband, does not organize activities for guests, nor is she British. (*See* Compl. ¶¶ 36(g), (h), (j).) There is no basis to claim any similarity between them.

who is a former child star; (6) Liliana, Geronimo's 17-year-old daughter, who never knew her mother and sees Lucy as a mother figure. None of these characters appears in *The Guest Book*, nor do Plaintiffs contend that they do.

The guest characters portrayed in Plaintiffs' works similarly have no counterparts in *The Guest Book*. *The Guest Book* does not feature: (1) a comic with an uncontrollable twitch who is looking to rediscover his funny bone (Alex Glitch); (2) a Puerto Rican woman pretending to be Jewish to meet a wealthy man (Jennifer Gold); (3) an insecure man in his sixties who uses dated humor, is irritating and callous, takes Viagra and is pretending to be Jewish (Stuart Levine); (4) a selfless, married woman who loves her marriage and children, but is in a mid-life crisis and wants to end her marriage (Paula Holmes/Burger), (5) a former electrical engineer battling depression who is in a downward spiral but hopes to save his 25-year marriage through song (Ted Holmes/Burger); (6) a local hippie; (7) a guest who speaks in clichés; (8) a gay couple on their honeymoon who learn to dance salsa (9) guests who argue polar opposite political views; (10) a sexually active couple whose loud love-making annoys other guests; (11) a washed-up 80s rock band, or (12) Jim Morrison (or a look-alike). Additionally, Plaintiffs' laundry list of additional guests and uninvited guests in the Treatment, with no description of those characters' traits, are not sufficiently distinctive or developed to be protectable (*Olson*, 855 F.2d. at 1451-52; *Tanksley*, 259 F.Supp.3d at 290-91), nor do they exist in *The Guest Book*.[10]

---

[10] Plaintiffs' contention that *The Guest Book* infringes their works because their Treatment includes a guest character whose entire description consists of one word, "atheist," whose gender is not specified, whereas *The Guest Book* includes a character – Lynn from Story Two – who is also an atheist, strains credulity and, if credited, would turn copyright law on its head. Plaintiffs cannot own a monopoly on the idea of having an "atheist" character. Furthermore, this one-word expression of Plaintiffs' atheist guest character does not encapsulate the Lynn character, expressed in *The Guest Book* as a woman who was an atheist, but after landing in the hospital after her mother-in-law secretly drugged and baptized her, actually finds God, thereby abandoning atheism.

Similarly, none of the recurring characters in *The Guest Book* can be found in Plaintiffs' works. None of the *B&B* works feature the following recurring *The Guest Book* characters: (1) an older, African American couple who manage a rental property and are looking to spice up their marriage (Wilfred and Emma); (2) a crude, amoral, overweight strip club owner who blackmails her clientele (Vivian); (3) an African American young man with a conscience who lost his father and is hesitant to follow the instructions of his amoral step-mother (Frank); (4) a divorced doctor, racked with guilt over his failed marriage who tries to connect with his son (Dr. Brown); (5) a single, female police officer who is obsessed with dating another character (Officer Leahy); or (6) male computer-store employees, one of whom is enthusiastic and talkative, the other of whom is quiet and aloof (Woody and Arlo).

Nor do any of the *B&B* works feature any of *The Guest Book*'s significant guest characters: (7) a young, single teacher looking to give his wife a much-needed break from parenting, while hoping to rekindle the couple's sex life (Tim, Story One); (8) a middle-aged veterinary nurse and devout Catholic who secretly drugs and baptizes her future daughter-in-law then renounces her own faith in God (Jill, Story Two); (9) a wife who helps another woman escape a polygamous marriage and is a bit of a loose cannon when she drinks (Phyllis, Story Three); (10) a former porn-star and drug addict hoping to hide her past and connect with her boyfriend's daughter, but is only able to do the latter after taking drugs, with the aid of a talking mouse (Christy, Story Four); (11) a doctor at the forefront of a new treatment for dementia who lets her racist, misogynist, reprehensible test-case patient die (Dr. Galiff, Story Five); (12) a handsome poet/scam artist who would rather turn tail and run than testify against a drug cartel or experience a real romantic connection (Blake, Story Six); (13) a man who loves to count things and goes to extremes to try to find love but cannot recognize it when it *literally* knocks on his door (Adam, Story Seven); (14) a

young man who hopes to marry his girlfriend and break her drug addiction and succeeds on both counts with the help of a bear on crystal meth (Tommy, Story Eight); (15) an Amish teen on Rumspringa who tries to commit suicide until he becomes convinced that God wants him to be with Marcia from *The Brady Bunch* (Jacob, Story Nine).[11]

### 4. There is No Similarity in Themes.

"A work's theme is its overarching message." *Silas*, 201 F.Supp.3d at 1180; *see Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994) (describing one work's theme as a "celebrat[ion] [of] family values" and another's as "the triumph of good over evil").

Here, the themes of the works are vastly different. Taking its cue from Lucy's upbeat attitude and zest for life, the overarching, optimistic theme of the *B&B* works is a celebration of the value of a positive attitude and a commitment to improving the lives of guests through fun experiences and kindness. Lucy's guests must be as happy as she is, or she simply tries harder.

The theme of *The Guest Book* could not be more different. Consistent with its dark humor, each episode is relentlessly cynical. Though *The Guest Book* injects a touch of humor into dark subjects like infidelity, blackmail, rampant drug use and addiction, racism, polygamy, murder, kidnapping and suicide.

### 5. There is No Similarity in Mood.

The mood of each *B&B* work is cheerful and optimistic, with un uplifting message for all, as befits Lucy's positive attitude. Conversely, the mood of *The Guest Book* is, overall, cynical

---

[11] Plaintiffs' claim that some characters in the competing works are similar because they have similar physical features and clothing (Compl. ¶¶ 36(m), (n), (u); DE 1-5, at 4-6) is ludicrous. Not only are there obvious differences in the characters' respective physical appearance (DE 1-5, at 4-5), but even if there were not, a copyright plaintiff cannot establish substantial similarity on this basis. *Newt v. Twentieth Century Fox Film Corp.*, No. 15-cv-2778, 2016 WL 4059691, at *11 (C.D. Cal. July 27, 2016) ("alleged 'similarities' in style and dress (e.g., jackets, coats, hats, dresses, hair styles, eyewear, and jewelry) are too common and generic" to be protectable)); *Shame On You Prods., Inc. v. Banks*, 120 F.Supp.3d 1123, 1164 (C.D. Cal. 2015) ("a pretty blonde in her thirties is not a character that can be copyrighted").

and reflects twisted and occasionally depraved subject matter (all portrayed for dark humor), such as crystal meth use, murder, an unauthorzed baptism, a drugged bear, attempted suicide, repeated blackmail, racism, and polygamy.

6.      **There is No Similarity in Pace.**

Here, there is no similarity in the pace of the parties' works.  There is no indication of pace in Plaintiffs' works.  Plaintiffs' Sizzle Reel is in the format of a trailer and consists almost entirely of scattered snippets of scenes, and Plaintiffs' Bible and Treatment are completely silent as to the show's pace.  Brenner Decl., Exs. 1-3.  *The Guest Book*, on the other hand, has a rapid pace that is accelerated by cross-cutting between stories and quick cuts between action and result.  For example, Tim in Story One decides to drive to Best Buy to get a humidifier, which is followed by a cut to a humidifier in the passenger seat of his car; Jacob in Story Nine asks for directions to a hardware store, which is followed by a cut to him unrolling a tarp inside Froggy Cottage; and Story Eight features chaotic cuts of Marla using, then reacting to, drugs.

7.      **There is No Similarity in Dialogue.**

To support a claim of substantial similarity of dialogue, a plaintiff must demonstrate "extended similarity of dialogue."  *Olson*, 855 F.2d at 1450.  The Complaint does not contain a single instance of alleged similarity in dialogue, which is not surprising, as there is none.  (*See* Compl.)  This wholesale lack of similar dialogue further reinforces the overall lack of similarity here.  *See Risdon v. Walt Disney Prods.*, No. 83-cv-6595, 1984 WL 1181 *3 (S.D.N.Y. Nov. 2, 1984) (beyond the substance of the stories, "the dialogue is an important basis of comparison.").

8.      **There is No Similarity in Sequence of Events.**

"The sequence of events refers to the actual sequence of the scenes, not just having similar scenes out of sequence."  *Bernal v. Paradigm Talent and Literary Agency*, 788 F.Supp.2d 1043, 1072 (C.D. Cal. 2010).  Here, as with the plots, which are wholly dissimilar, the sequences of

events in the works are entirely different. The more fleshed out Bible and Treatment take an even more divergent path than the Sizzle Reel, and a review of the works quickly reveals that the sequence of events in *B&B* and *The Guest Book* bear no resemblance.

### 9. Plaintiffs' Works And *The Guest Book* Do Not Have the Same Title.

"[T]itles by themselves are not subject to copyright protection." *Hobbs*, 2012 WL 5342321, at *6; *Peters*, 776 F.Supp.2d at 749; *see also* 37 C.F.R. § 202.1(a) ("Words and short phrases such as names, titles, and slogans" are not copyrightable.).[12]

A simple review of the works reveals that their titles are nothing alike. Each of Plaintiffs' works is titled, "*B&B If These Walls Could Talk*." DE 1-2 & 1-3; Brenner Decl., Exs. 1-3. Defendants' work is simply titled "*The Guest Book*." Brenner Decl., Ex. 4. In a desperate attempt to manufacture similarity where none exists, Plaintiffs' misrepresent the title of Defendants' work as *The Guest Book If These Walls Could Talk*, citing advertisements for *The Guest Book* that include the phrase "if these walls could talk." *See* Compl. ¶ 2-3, 36, 36(a); DE 1-5, at 3. This is a red herring. The key inquiry is whether the *B&B* works, on one hand, and *The Guest Book* itself – not Plaintiffs' false description thereof or an advertisement therefor – are similar. *Theotokatos*, 971 F.Supp. at 340-41 (the works themselves supersede and control any contrary allegations or descriptions of the works as contained in the pleadings). They are not.

### 10. Plaintiffs' List of Random Alleged Similarities Cannot Support A Claim And, In Any Event, Is Riddled With Inaccuracies.

Courts have squarely rejected Plaintiffs' approach of manufacturing a copyright claim by pointing to a self-serving chart or random list of purportedly similar elements between the works.

---

[12] Contrary to Plaintiffs allegation, the phrase "if these walls could talk" is never uttered in any episode of *The Guest Book*, nor is it part of the show's title. *See generally*, Brenner Decl., Ex. 4; *see also* infra Section III.C.10; (Compl. ¶ 36(c); DE 1-5, at 3). Moreover, use of the phrase "if these walls could talk" in an entertainment work is hardly original to Plaintiffs' works. *See* RJN at 10-12.

*See, e.g., Kouf*, 16 F.3d at 1045-46 (works not substantially similar as a matter of law where plaintiff claimed they shared a "compilation of 'random similarities scattered throughout the works[,]' such as a lawnmower scene, a sprinkler scene, the presence of an attic, danger scenes, concerned parents, and kids sleeping outside overnight"). Scattershot lists of random fragments of scenes and characteristics are "inherently subjective and unreliable," and "cannot support a finding of substantial similarity." *Litchfield*, 736 F.2d at 1356; *Williams*, 84 F.3d at 590.

Plaintiffs' chart of selective alleged "similarities" (Compl. ¶¶ 36(a)-(w)) illustrates why courts disfavor this approach. The overwhelming majority of Plaintiffs' claimed similarities are based on false statements or distorted descriptions of the parties' works that are belied by a review of the works themselves. (*See* Compl. ¶¶ 36(a), (b), (d), (f)-(i), (l)-(o), (q)-(w).) Several items Plaintiffs identify are neither comparisons nor claimed similarities at all. (*See id*. ¶¶ 36(c), (e), (j), (p). The final alleged similarity is a generalized plot idea that is not protectable in the first instance, and, as an ocular comparison of the works reveals, is expressed differently in the parties' competing works. (*See id*. ¶ 36(k).)

## IV.   CONCLUSION

WHEREFORE, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint, with prejudice, and such other and further relief as the Court deems just and proper.

Dated: February 5, 2018                     Respectfully submitted,

                                            */s/ Brian A. Sher*
                                            BRYAN CAVE LLP
                                            161 N Clark Street, Ste 4300
                                            Chicago, IL 60601
                                            Telephone: (312) 602-5000
                                            Facsimile: (312) 602-5050
                                            *Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on February 5, 2018, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will provide notice to all counsel of record.

/s/ Brian A. Sher
Brian A. Sher